http://www.va.gov/vetapp16/Files4/1634357.txt

Citation Nr: 1634357 
Decision Date: 08/31/16 Archive Date: 09/06/16

DOCKET NO. 07-24 085 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Huntington, West Virginia

THE ISSUES

1. Entitlement to an evaluation in excess of 20 percent for the service-connected right knee disability prior to August 29, 2005.

2. Entitlement to an evaluation in excess of 30 percent for the service-connected right knee disability from October 1, 2006, to May 6, 2014, and to an evaluation in excess of 60 percent from that date.

REPRESENTATION

Appellant represented by: Disabled American Veterans

WITNESS AT HEARINGS ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

J. H. Nilon, Counsel

INTRODUCTION

The Veteran served on active duty from September 1984 to January 1986.

This matter comes before the Board of Veterans' Appeals (Board) on appeal of a January 2005 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Huntington, West Virginia that denied the Veteran's request for an evaluation higher than 20 percent for her right knee disability. Also on appeal is a September 2005 RO rating decision that granted a 100 percent evaluation for the right knee disability from August 29, 2005, to October 1, 2006, and assigned a 30 percent rating from October 1, 2006.

The Agency of Original Jurisdiction (AOJ) issued a rating decision in January 2015 that increased the evaluation of the right knee disability to 60 percent effective from May 6, 2014. The Board has characterized the issues on the title page to comport with that development.

In August 2008 the Veteran testified before the undersigned Veterans Law Judge Mark D. Hindin in a videoconference from the RO, and in June 2010 he testified before the undersigned Veterans Law Judge Kathleen Gallagher in a "travel board" hearing conducted at the RO. Transcripts of both hearings are of record. 

In September 2010 the Board remanded the case to the Agency of Original Jurisdiction (AOJ) for additional development which has been accomplished. Stegall v. West, 11 Vet. App. 268, 271 (1998).

FINDINGS OF FACT

1. Prior to August 29, 2005, the Veteran's right knee disability was manifested by flexion to 90 degrees prior to onset of pain, with normal extension and no clinical evidence of instability. 

2. The Veteran had a total right knee replacement on August 29, 2005, and received compensation at the 100 percent level during convalescence from that surgery until October 1, 2006.

3. From October 1, 2006, to March 28, 2013, the Veteran's right knee postoperative residuals were manifested by flexion to 90 degrees prior to onset of pain, with normal extension and no clinical evidence of instability. 

4. From March 28, 2013, to May 4, 2014, the Veteran's right knee postoperative residuals were manifested by flexion to 40 degrees prior to onset of pain, with normal extension and clinical evidence of mild instability.

5. From May 4, 2014, the Veteran's right knee postoperative residuals have been manifested by severe painful motion and weakness in the knee with continued slight instability. 

CONCLUSIONS OF LAW

1. The requirements for an evaluation in excess of 20 percent for the right knee disability prior to August 29, 2005, have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.40, 4.45, 4.71a, Diagnostic Codes 5257, 5261, 5263 (2015).

2. The requirements for an evaluation in excess of 30 percent for the right knee disability from October 1, 2006, to May 4, 2014, have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.40, 4.45, 4.71a, Diagnostic Code 5055 (2015).
3. The requirements for an evaluation in excess of 60 percent for the right knee disability from May 4, 2014, have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.40, 4.45, 4.71a, Diagnostic Code 5055 (2015).

4. The requirements for a separate evaluation for slight instability of the right knee, status post total knee replacement, were met effective from March 28, 2013. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.40, 4.45, 4.71a, Diagnostic Code 5257 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Due Process Considerations

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). In the instant case, VA's duty to notify was satisfied by a December 2008 letter sent prior to the issuance of the rating decision on appeal. See 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015); Pelegrini v. Principi, 18 Vet. App. 112 (2004). In any event, the Veteran has expressed no prejudice in regard to the timing or content of notice provided. See Shinseki v. Sanders, 129 S.Ct.1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination). The RO last readjudicated the issues on appeal in January 2015.

The VCAA also requires VA to make reasonable efforts to help a claimant obtain evidence necessary to substantiate her claim. 38 U.S.C.A. § 5103A; 38 C.F.R. §§ 3.159(c), (d). This "duty to assist" contemplates that VA will help a claimant obtain records relevant to her claim, whether or not the records are in Federal custody, and that VA will provide a medical examination or obtain an opinion when necessary to make a decision on the claim. 38 C.F.R. § 3.159(c)(4).

In the instant case, the Board finds that all relevant facts have been properly developed and that all evidence necessary for equitable resolution of the issue decided herein has been obtained. The Veteran's service treatment and post-service treatment records, including Social Security Administration (SSA) disability records, have been obtained and considered. The Veteran has not identified any additional, outstanding records that have not been requested or obtained. The Veteran has been afforded two hearings before the Board in which she presented oral argument in support of her claim.

Furthermore, Board finds there has been substantial compliance with the Board's January 2014 remand directives and no further action in this regard is necessary. See D'Aries v. Peake, 22 Vet. App. 97 (2008) (holding that only substantial, and not strict, compliance with the terms of a Board remand is required pursuant to Stegall v. West, 11 Vet. App. 268, 271 (1998)). In this regard, the matter was remanded in order to afford the Veteran a VA medical examination, which was performed in May 2014. The Board has reviewed the examination report and finds the examiner substantially complied with the requirements articulated in the Board's remand; the Board also finds the medical evidence now of record provides a sufficient basis for adjudication of the claims on appeal. The Board's remand also directed the AOJ to obtain outstanding VA treatment records as well as any outstanding non-VA treatment records identified by the Veteran; this was accomplished. In sum, the Board finds there has been substantial compliance with the remand instructions and no further action is necessary.

In light of the foregoing, the Board finds that VA's duties to notify and assist have been satisfied. Thus, appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384, 394 (1993).

Evidence and Analysis

Applicable legal principles

Disability ratings are determined by applying the criteria set forth in the VA Schedule of Rating Disabilities (Rating Schedule) and are intended to represent the average impairment of earning capacity resulting from disability. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. Disabilities must be reviewed in relation to their history. 38 C.F.R. § 4.1. Other applicable, general policy considerations are: interpreting reports of examination in light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating many accurately reflect the elements of disability, 38 C.F.R. § 4.2; resolving any reasonable doubt regarding the degree of disability in favor of the claimant, 38 C.F.R. § 4.3; where there is a questions as to which of two evaluations apply, assigning a higher of the two where the disability pictures more nearly approximates the criteria for the next higher rating, 38 C.F.R. § 4.7; and, evaluating functional impairment on the basis of lack of usefulness, and the effects of the disability upon the person's ordinary activity, 38 C.F.R. § 4.10. See Schafrath v. Derwinski, 1 Vet. App. 589 (1991). 

A claimant may experience multiple distinct degrees of disability that might result in different levels of compensation from the time the increased rating claim was filed until a final decision is made. Thus, separate ratings can be assigned for separate periods of time based on the facts found - a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

Disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination and endurance. The functional loss may be due to absence of part or all of the necessary bones, joints and muscles, or associated structures, or to deformity, adhesions, defective innervation, or other pathology, or may be due to pain, supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part which becomes painful on use must be regarded as disabled. See DeLuca v. Brown, 8 Vet. App. 202 (1995); 38 C.F.R. § 4.40; see also 38 C.F.R. §§ 4.45, 4.59. Although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32 (2011).

Instability and subluxation of the knee is rated under DC 5257. A rating of 10 percent is assigned for slight disability; a rating of 20 percent is assigned for moderate disability; and, a rating of 30 percent is assigned for severe disability. 38 C.F.R. § 4.71a.
 
Limitation of flexion of a leg is rated under DC 5260. A rating of 0 percent is assigned for flexion is limited to 60 degrees; a rating of 10 percent is assigned for flexion limited to 45 degrees; a rating of 20 percent is assigned for flexion limited to 30 degrees; and, a rating of 30 percent is assigned for flexion is limited to 15 degrees. Id.

Limitation of extension of a leg is rated under DC 5261. A rating of 0 percent is assigned for extension limited to 5 degrees; a rating of 10 percent is assigned for limitation of extension to 10 degrees; a rating of 20 percent is assigned for extension limited to 15 degrees; a rating of 30 percent is assigned for extension limited to 20 degrees; a rating of 40 percent is assigned for extension limited to 30 degrees; and, a rating of 50 percent is assigned for extension limited to 45 degrees. Id.

Normal range of motion (ROM) of the knee is extension to 0 degrees and flexion to 140 degrees. 38 C.F.R. § 4.71a, Plate II. 

Precedent opinions of the VA's General Counsel have held that dual ratings may be given for a knee disorder, with one rating for instability (Diagnostic Code 5257) and one rating for arthritis with limitation of motion (Diagnostic Codes 5003 and 5010). VAOPGCPREC 9-98 (63 Fed. Reg. 56,704 (1998)) and 23-97 (62 Fed. Reg. 63,604 (1997)). Another such opinion held that separate ratings under Diagnostic Code 5260 (leg, limitation of flexion) and Diagnostic Code 5261 (leg, limitation of extension) may be assigned for disability of the same joint. VAOPGCPREC 9-2004 (69 Fed. Reg. 59988 (2004)).

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. See Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the benefit of the doubt shall be given to the claimant. 38 U.S.C.A. § 5107(b). When a reasonable doubt arises regarding service origin, such doubt will be resolved in the favor of the claimant. Reasonable doubt is doubt which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim. 38 C.F.R. § 3.102. The question is whether the evidence supports the claim or is in relative equipoise, with the claimant prevailing in either event, or whether a fair preponderance of the evidence is against the claim, in which event the claim must be denied. See Gilbert, 1 Vet. App. at 54.

Evaluation prior to August 29, 2005

The Veteran's claim for increased rating was received in August 2004. The period under review begins August 2003, one year before the claim was received. 38 C.F.R. §§ 3.400(o); Quarles v. Derwinski, 3 Vet. App. 129, 135 (1992).

In May 2004 the Veteran presented to the VA walk-in clinic complaining of shin pain. Examination of the knee showed full ROM. The clinical impression was erythema of the shin. X-ray of the knee showed joint space narrowing in the medial compartment.

Also in May 2004 the Veteran presented to Thomas Memorial Hospital emergency room complaining of right knee pain, 7/10 in severity. She reported that ibuprofen was not resolving her pain. X-ray of the knee showed osteoarthritic-type changes and osteopenia; ROM was not noted. The Veteran was given a prescription for narcotic pain medication and provided crutches; she was advised to be nonweightbearing for one week and to follow up with her primary care provider.

The Veteran presented to the VA primary care clinic (PCC) in June 2004 complaining of intermittent right knee pain, 5/10 in severity. Examination showed the Veteran to have normal gait, with good tone and power. The clinician's impression was osteoarthritis of the right knee and pain syndrome from former injury.

The Veteran had a VA orthopedic consult in July 2004 in which the surgeon noted complaint of pain in the medial joint with swelling and giving out, with grinding sensation with weight bearing and pain also at rest. Examination showed 2+ laxity in the medial joint but negative McMurray's sign. There was mild swelling but good ROM. Valgus deformity was present with weight bearing. X-ray showed advanced degenerative joint disease (DJD) in the right knee. 

The Veteran was issued a right knee brace by the VA rehabilitative services clinic in August 2004. 

In September 2004 the Veteran presented to the VA orthopedic clinic complaining of constant right knee pain, 8/10 in severity. The Veteran was referred to the rehabilitative services clinic for adjustment of her brace.

The Veteran had a VA compensation and pension (C&P) examination of the right knee in November 2004 in which she complained of steady right knee pain, 4/10 in severity occasionally increasing to 8-9/10. The knee pain would occasionally wake her at night. She reported stiffness with lifting, with standing longer than 10 minutes, with driving longer than 45-60 minutes and with sitting 1-2 hours. She reported swelling but no heat, redness or locking. She reported instability but denied falls. Regarding fatigability, she reported being able to stand for 30 minutes at most but discomfort after 10 minutes; she could walk for at most a quarter- to a half-mile. She endorsed flare-ups 3-4 times per week associated with climbing stairs and lasting 30 minutes per episode. The Veteran denied using a cane or other ambulatory device. She stated she had a knee brace but was not wearing it because it did not fit well. Reported functional impairment was difficulty climbing stairs at work and difficulty at home lifting objects, stooping or squatting.

Examination showed the Veteran to walk favoring the right knee, bearing much of her weight on the left. The right knee was tender to palpation. The knee was stable. There was muscle atrophy in the right leg, and right leg strength was 4/5 compared to 5/5 in the left. Active ROM was 120 degrees flexion with pain beginning at 90 degrees (the left knee had 130 degrees of flexion). After repetitive motion flexion the right knee was reduced to 105 degrees of flexion. Extension of both knees was 0 degrees (normal) including after repetitive motion. Both knees had popping but stability testing was normal. The clinical impression was tri-compartmental degenerative changes of the right knee.

The Veteran presented to the VA orthopedic outpatient clinic in March 2005 complaining of constant knee pain 8/10 in severity. Conservative treatment including a series of Synvisc injections had not resolved her pain to acceptable level, and the clinician noted the Veteran would need a total knee replacement (TKR). The Veteran was accordingly scheduled for TKR on August 29, 2005.

On August 19 the Veteran had a preoperative history and physical examination in which the examiner noted the Veteran to have full active range of motion (FAROM) without pain, swelling, effusion, crepitance, dislocation, swelling or joint laxity. There was also no muscular swelling, atrophy or tenderness and no obvious deformity or asymmetry. The clinician's impression was right knee pain and DJD, pre-total knee arthroplasty (TKA). TKR was performed as scheduled on August 29, 2005.

The Veteran testified before the Board in August 2008 regarding her symptoms prior to August 29, 2005. She testified that prior to her surgery she was unable to walk on uneven ground or climb stairs; she was essentially restricted in her activities. She used a back brace, but it was uncomfortable and cumbersome. The Veteran testified that her symptoms in 2004 were as severe as they were just prior to surgery, so she feels that she should be compensated at the post-surgical 30 percent effective from 2004.

The Veteran had a travel board hearing in June 2010 in which she testified that she had a VA C&P examination prior to August 2005 in which the examiner had not noted instability, but her knee was nonetheless unstable from service until her knee replacement surgery. In fact, her greatest functional limitation prior to surgery was instability.

On review of the evidence above, the Board finds a rating in excess of 20 percent is not warranted prior to August 29, 2005. The Veteran's flexion on examination was to 90 degrees prior to onset of pain, which is actually noncompensable under DC 5260, although at least 10 percent is warranted for painful motion of an arthritic joint where ROM is not compensable. VAOPGCPREC 09-98 (August 14, 1998), citing Lichtenfels v. Derwinski, 1 Vet. App. 484 (1991). The Veteran did not have compensable limitation of extension under DC 5261, and there is no indication of pain with extension to warrant separate compensation. The Veteran asserts the knee was unstable prior to August 2005, but the examination in November 2004 characterized the knee as clinically stable. Although the Veteran is competent to report subjective sensation of instability, actual stability versus instability is a medical determination that is not within the Veteran's competence as a layperson.

In sum, the Board finds the criteria for a rating in excess of 20 percent for right knee disability prior to August 29, 2005, have not been met. Her appeal to that extent is denied.

Evaluation from October 1, 2006

The Veteran had a total right knee replacement on August 29, 2005. Under DC 5055, a rating of 30 percent is the minimum rating after knee replacement, or with intermediate degrees of residual weakness, pain or limitation of motion rated by analogy to DCs 5256, 5261 or 5262. A rating of 60 percent is assigned with chronic residuals consisting of severe painful motion or weakness in the affected extremity.

The period under review begins October 1, 2006, the date the 100 percent postoperative evaluation terminated and the Veteran's rating was restored to 30 percent under DC 5055.

The Veteran had a Physical Residual Functional Capacity Assessment in April 2007, performed in support of her claim for SSA disability benefits. The examiner noted physical impairment due to thoracic and lumbar strain (primary diagnosis) and status post right knee replacement (secondary diagnosis). The Veteran was characterized as being unable to ever balance, to climb ladders/rope/scaffolds, to crouch or to crawl; and, occasionally unable to climb stairs/ramps, to stoop or to kneel. The Veteran was found to be frequently able to lift 10 pounds and occasionally able to lift 20 pounds and able to stand/walk or sit for six hours during a normal eight-hour day with routine breaks. The examiner stated that the Veteran's symptoms were partly supported by physical reports; in regard specifically to the right knee the examiner stated the Veteran was complaining of right knee pain but was shown to have good ROM.

The Veteran also had an examination of the knee in April 2007 by Dr. WNM, performed in support of her claim for SSA benefits. The Veteran's gait was not antalgic and right knee ROM was to 90 degrees (the left knee had normal flexion to 150 degrees). Strength in all extremities was 5/5. The Veteran complained of decreased sensation on the lateral aspect of the right knee, which was confirmed on examination. No effusion or crepitus was noted. The report is silent in regard to stability. 

In April 2008 the Veteran presented to the VA PCC complaining of occasional pain in the right knee. Examination of the knee showed edema, with a scar. 

The Veteran testified before the Board in August 2008 regarding her symptoms since October 2006. She testified that she could now stand longer than she could before surgery, but she still had aching and swelling.

The Veteran had a VA C&P examination in October 2009 in which she complained of a sensation of having a piece of steel in her knee, which becomes very cold during cold weather. She endorsed problems bending, squatting and walking on uneven ground. She also reported having areas of anesthesia and dysesthesia on the knee. Current treatment consisted of medication (ibuprofen), bracing and exercising. Response to treatment was reportedly good, without side effects. She endorsed deformity, pain, stiffness, weakness and decreased speed of motion; she denied instability, giving way, incoordination, locking, dislocation, effusion or symptoms of inflammation. She endorsed flare-ups every 2-3 weeks, moderate in severity and lasting one day. Such flare-ups were associated with increased activity and cold weather, and were relieved by rest and decreased activity. The Veteran denied constitutional symptoms of arthritis or incapacitating episodes of arthritis. She stated she was able to stand for up to one hour and denied limitations of walking. She endorsed using a cane and a brace, intermittently but frequently.

Examination showed the Veteran to have normal gait, without evidence of abnormal weight-bearing. The knee showed bony enlargement, tenderness, weakness and guarding of movement. There was no grinding or instability. The meniscus was surgically absent. The joint showed weakness, characterized as "moderate" by the examiner. ROM or the right knee was flexion to 120 degrees (compared to 140 degrees left knee) without objective evidence of pain with motion, to include repetitive movement. Extension was normal. The joint was not ankylosed. The legs were equal in length. The examiner noted a surgical scar on the right knee that was not clinically significant. X-ray showed postoperative changes. The examiner diagnosed postoperative changes status post knee replacement. The examiner noted the following functional impairments associated with the disability. There was no occupational impairment since the Veteran was not currently employed; in that regard the Veteran stated she was about to begin working a sales job. Impairment of activities of daily living was as follows: prevents sports; moderate impairment of recreation; mild impairment of chores; no impairment of shopping, exercise, traveling, feeding, bathing, dressing, toileting, grooming or driving. 

The Veteran had a travel board hearing in June 2010 in which she testified that despite her knee replacement surgery she continues to have pain and reduced ROM. She stated she walks every day for exercise as advised by her surgeon. She endorsed wearing knee brace relatively often, when she knows she will be on her feet for an extended period. Her only current medication was over-the-counter Tylenol. Her current symptoms included stiffness, especially in winter, and a feeling of steel in the joint. She also testified of numbness in some areas and pain in others but denied tingling or burning. Severity of symptoms is increased by cold weather and heightened activity. She is no longer able to play sports or jog and is unable to squat. She places weight on her left knee to favor the right, and sometimes consequently uses a cane. When driving about an hour she has to stop and walk around because the knee becomes stiff. She is able to climb stairs but has to do so one at a time. 

A disability determination by SSA shows the Veteran was granted SSA disability benefits effective from May 2012 due to functional psychotic disorder (primary diagnosis) and osteoarthrosis and allied disorders (secondary diagnosis). An associated medical impairment analysis characterizes schizophrenia as primary and "severe" and also notes other psychiatric diagnosis (anxiety disorders) as "severe;" reconstructive surgery of weightbearing joint was characterized as secondary and "non-severe." The examiner stated the Veteran's physical disability does not preclude gainful sedentary work (the Veteran was noted to have postgraduate college education). 

The Veteran had a VA C&P examination of the knee in March 2013. She complained of instability of the knee and stated she had been found to have a protruding surgical screw that might require corrective surgery. She reported constant pain 6-7/10 in severity and stated her knee does not bend well, causing trouble on stairs and uneven ground. She also complained of trouble bending and stooping and stated that kneeling is impossible. Medication consisted of over-the-counter pain medications twice daily. She described a recent flare-up while carrying a heavy load that caused her to have to rest for one hour. 

Examination of the knee showed flexion to 45 degrees with pain at 40 degrees. Extension was normal, without evidence of pain. (The left knee had flexion to 85 degrees and normal extension, both without pain.) After repetitive use the Veteran had right knee flexion to 55 degrees (left knee flexion to 95 degrees) and continued normal extension. Repetitive use testing resulted in additional limitation of function due to pain (right only), less movement than usual (bilateral), instability of station (right only) and interference with sitting, standing or weightbearing (right only). Neither knee was tender to palpation along the joint. Muscle strength for both flexion and extension was 4/5 right and 5/5 left. The right knee was unstable anterior and posterior at 1+ (0-5 mm); the left knee was stable. Medial-lateral stability was normal bilaterally. There was no evidence of recurrent patellar subluxation or dislocation and no sign of meniscus symptoms. The examiner noted the Veteran had a right TKR in 2005 but did not note the extent of residuals. The examiner noted the Veteran was not using a cane on the day of examination but endorsed occasionally using a cane due to knee pain. Current X-ray was unremarkable, with normal bony alignment and no evidence of hardware malfunction. 
 
The examiner diagnosed total right knee in 2005. In regard to occupational impairment, the Veteran reported she is currently disabled and not working, and in receipt of SSA disability benefits due to her knee. If she did go back to work she would have problems with prolonged standing, stairs and uneven ground due to knee pain and weakness. 

The Veteran had another VA C&P examination of the knee in May 2014. The Veteran complained the knee is weak, unstable and gives out when walking; she also complained of a screw protruding from the bone. She endorsed flare-ups associated with walking more than a quarter mile and with squatting or kneeling. Examination showed flexion to 95 degrees with pain at 15 degrees; extension ended at 15 degrees with pain at that point. Repetitive motion testing resulted in flexion to 90 degrees and extension to 15 degrees; repetitive motion testing caused additional limitation of function due to less movement than normal, weakened movement, excess fatigability, pain on movement, swelling, atrophy of disuse, instability of station, disturbance of locomotion and interference with sitting, standing and weightbearing. The right knee was painful to palpation. (There are no corresponding ROM data regarding the left knee). Right knee strength was 4/5, compared to 5/5 in the left knee. Stability tests showed 1+ instability (0-5 mm) in all directions (anterior, posterior and medial-lateral). There was no indication of meniscus condition. The examiner noted a surgical scar that was not clinically significant. The right thigh was 2 cm smaller than the left, consistent with atrophy. There were no palpable screw heads and no history or evidence of patellar subluxation or dislocation. The Veteran endorsed occasionally using a neoprene sleeve as an assistive device. 

The examiner diagnosed right total knee replacement with instability. As regards occupational impairment, the Veteran reported having last worked in 2010, as a social worker; the examiner stated the right knee disability would prevent prolonged weightbearing tasks (standing/walking) but would not limit or prevent sedentary tasks.

The Veteran had a VA compensation and pension examination of the thoracolumbar spine in September 2014 in which the examiner noted normal strength (5/5) in the bilateral knee, normal sensation in the bilateral thighs/knees and no muscle atrophy. 

On review of the evidence above the Board finds that from October 1, 2006 (the day the 100 percent postoperative evaluation expired) to May 6, 2014 (the date of the most recent VA examination), the Veteran's symptoms most closely approximated the criteria for the currently-assigned 30 percent rating. The Veteran's flexion during the period was at worst to 40 degrees prior to onset of pain; when rated by analogy under DC 5260 such limitation of flexion would fall squarely under the criteria for a 20 percent rating. There was no indication during the period of limitation of extension. Accordingly, the criteria for a rating higher than 30 percent under DC 5055, or by analogy under DC 5260/5261, were not met prior to May 6, 2014.

However, the Board finds the VA examination on March 28, 2013, establishes entitlement to separate compensation for instability. The examiner on that occasion noted 1+ anterior and posterior disability, although medial-lateral stability was normal. The Board finds this constitutes clinical evidence of slight instability, for which a rating of 10 percent is warranted under DC 5257.

The Board notes at this point that the terms "mild," "moderate" and "severe" are not defined in the rating schedule; rather than applying a mechanical formula, VA must evaluate all the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6. The Disability Benefits Questionnaire (DBQ) evaluation criteria for knee examinations ask the examiner to identify whether instability, if present, falls within the range of 1+ (0-5 mm), 2+ (5-10 mm) or 3+ (10-15 mm). These examination criteria provide an equitable basis on which to find that 1+ instability, which is shown here, is "slight," whereas 2+ would be "moderate" and 3+ would be "severe."

The Board further notes that VA examination in May 2014, based on which the AOJ assigned a higher rating under DC 5055, recorded continued 1+ instability (anterior, posterior and medial-lateral). Accordingly, the evidence does not suggest that a rating higher than 10 percent for instability has been met after March 2013.

The Board has considered whether a rating higher than 60 percent is warranted after May 6, 2014. A rating of 100 percent under DC 5055 is warranted only during the first year after surgery. Extension was limited to 15 degrees on examination, which would warrant a 20 percent rating under DC 5261, and flexion was limited to 15 degrees prior to onset of pain, which would warrant a 30 percent evaluation under DC 5260, but this results in a 40 percent combined rating under the Combined Ratings Table, which is less favorable to the Veteran than the currently-assigned 60 percent rating under DC 5055. The Veteran is shown on examination to have weakness and atrophy of the right lower extremity, but severe weakness is specifically contemplated by the rating criteria of DC 5055.

In sum, the Board has found the Veteran to be entitled to a separate 10 percent evaluation for instability effective from March 23, 2013, and her appeal is accordingly granted to that extent. However, the criteria for a rating higher than 30 percent prior to May 6, 2014, and to an evaluation in excess of 60 percent from that date, have not been met.
 
Other rating considerations

The Board has considered whether the Veteran's disability presents an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards such that referral to the appropriate officials for consideration of extraschedular ratings is warranted. See 38 C.F.R. § 3.321(b)(1) (2015); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). The threshold factor is whether the disability picture presented in the record is adequately contemplated by the rating schedule. Thun v. Peake, 22 Vet. App. 111, 118 (2008). 

Here, the rating criteria reasonably describe the Veteran's disability level and symptomatology and provide for additional or more severe symptoms than currently shown by the evidence; thus, her disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. Id. at 115. 

The Veteran's right knee disability is manifested by signs and symptoms such as pain and weakness, which impairs her ability to carry weight and to perform tasks requiring full ROM. For all musculoskeletal disabilities, the rating schedule contemplates functional loss, which may be manifested by, for example, decreased or abnormal excursion, strength, speed, coordination, or endurance. 38 C.F.R. § 4.40 (2015); Mitchell, 25 Vet. App. 32, 37. For disabilities of the joints in particular, the rating schedule specifically contemplates factors such as weakened movement; excess fatigability; pain on movement; disturbance of locomotion; and interference with sitting, standing, and weight bearing. 38 C.F.R. §§ 4.45, 4.59; Mitchell, 25 Vet. App. at 37. 

Thus, the schedular criteria for musculoskeletal disabilities contemplate a wide variety of manifestations of functional loss. Given the variety of ways in which the rating schedule contemplates functional loss for musculoskeletal disabilities, the Board concludes that the schedular rating criteria reasonably describe the Veteran's disability picture as described in her correspondence to VA, her testimony before the Board, her statements to various medical examiners and the examination findings. In short, there is nothing exceptional or unusual about the Veteran's right knee disability because the rating criteria reasonably describe her disability level and symptomatology. Thun, 22 Vet. App. at 115. Accordingly, referral for extraschedular consideration for the disability is not warranted.

A request for a total disability rating based on individual unemployability (TDIU) is an attempt to obtain an appropriate rating for disability or disabilities, and is part of a claim for increased compensation. Rice v. Shinseki, 22 Vet. App. 447 (2009). The Veteran in this case does not assert, and the evidence of record does not suggest, that she is rendered unemployable solely due to the right knee disability on appeal. During the course of the claim on appeal the RO separately considered the question of entitlement to TDIU and denied TDIU by a rating decision in December 2014. The Board accordingly finds that a claim for TDIU is not raised by the increased-rating claim herein adjudicated.

ORDER

An evaluation in excess of 20 percent for right knee disability prior to August 29, 2005; in excess of 30 percent prior to May 6, 2014; and, in excess of 60 percent from that date, is denied.

An evaluation of 10 percent for instability of the right knee effective from March 28, 2013, is granted, subject to the regulations pertaining to the payment of monetary benefits.

_________________________ _________________________
KATHLEEN K. GALLAGHER MARK D. HINDIN
 Veterans Law Judge, Veterans Law Judge, 
 Board of Veterans' Appeals Board of Veterans' Appeals

______________________________________
S. C. KREMBS
Veterans Law Judge, 
Board of Veterans' Appeals

Department of Veterans Affairs